Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3369 | **DATE** | 8/15/2003 |
| **CASE TITLE** | Karla Kidd vs. Dobbs Temporary Services | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Ameritech's motion for summary judgment is granted in part and denied in part. Plaintiff Kidd's motion to strike the affidavit of Suzette Dolter is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 18 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 60 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | | |
| | | 03 AUG 15 PM 6:41 | date mailed notice | |
| TH ✓ | courtroom deputy's initials | FILED FOR DOCKETING | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KARLA M. KIDD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 02 C 3369 |
| | ) |
| DOBBS TEMPORARY SERVICES, | ) |
| INC., d/b/a Pro Staff Personnel Services, | ) |
| SBC / AMERITECH CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge,

Karla Kidd filed suit against Dobbs Temporary Services, Inc., doing business as Pro Staff Personnel Services, ("ProStaff") and SBC / Ameritech Corporation ("Ameritech") alleging that she was the victim of age and sex discrimination when Ameritech refused to hire her as a permanent employee and terminated her temporary assignment. Kidd stipulated to a dismissal of ProStaff. (R. 35-1). Subsequently, Ameritech moved for summary judgment. For the following reasons, the Court grants Defendant Ameritech's motion for summary judgment in part and denies it in part.[1]

## UNDISPUTED FACTS

### 1. Relevant Ameritech Entities

Ameritech provides telephone service to customers in the Chicago area. (R. 44-1, Pl.'s

---

[1] Kidd filed a motion to strike the affidavit of Suzette Dolter concurrently with her response to Ameritech's motion for summary judgment. The Court found it unnecessary to consider this affidavit. Consequently, the Court denies the motion to strike as moot.



56.1(b)(3)(A) Resp. at ¶ 2.) One of its related entities, SBC Global Markets, Managed Services and Custom Billing ("Custom Billing"), provides managed billing services to institutional and corporate clients. (*Id.* at ¶ 9, 10.)

Custom Billing generally staffs and trains a team of Billing Support Specialists for each of its accounts. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 16.) Each team has a designated "Team Lead." (*Id.* at ¶ 18.) Team Leads are not management employees, nor do they have an official job title, but rather are Billing Support Specialists who accept additional duties. (*Id.*)

Pam Ramirez served as the Director of Custom Billing. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 21.) Ramirez supervised Vicki Dammer, who oversaw Billing Support Specialists and designated Team Leads on certain accounts. (*Id.* at ¶¶ 22-24, 33.)

Custom Billing contracts for the services of workers from temporary services agencies such as ProStaff. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶¶ 19, 20.) The temporary positions are often of indefinite duration and sometimes last extended periods of time. (R. 54-1, Def.'s 56.1(b)(3)(A) Reply ¶ 15.) Custom Billing generally hired permanent workers from the pool of temporary workers. (*Id.* at ¶ 16.)

## II. Kidd's Assignment to Custom Billing

Karla Kidd, who was born in 1957, initially began an assignment for Ameritech in May 1999 through Manpower, a temporary employment agency. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶¶ 1, 26.) Kidd served as a Billing Support Specialist on the Commonwealth Edison account and reported to Dammer. (*Id.* at ¶ 27.) Kidd did not experience any discrimination during this assignment, which she left in September 1999. (*Id.* at ¶¶ 28, 29.)

In December 1999, Kidd applied for work with ProStaff, intending to obtain another

2

assignment with Custom Billing. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 30.) In January 2000, ProStaff assigned Kidd to Custom Billing. (*Id.* at ¶ 32.) Based upon Kidd's satisfactory work history, Dammer and Ramirez approved Kidd's referral as a temporary worker. (*Id.* at ¶ 33.)

Custom Billing initially trained Kidd on the Security Link account. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 34.) In March 2000, Custom Billing re-assigned Kidd, along with Susan Piano, Phillip Johnson, and Michael Troc, to the General Motors account. (*Id.* at ¶ 35.) Kidd's responsibilities on the General Motors account involved working on "trouble tickets." (*Id.* at ¶ 40.) Michael Troc, also assigned to the General Motors account, observed that Kidd focused only on her given assignment, whether given two things to do or twenty, and did not volunteer for any additional work or responsibilities. (*Id.* at ¶ 46.)

Supervisors noticed a demonstrable change in Kidd's attitude when she returned to Ameritech. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 45.) Ramirez frequently noticed that Kidd was away from her desk or absent from work altogether. (*Id.* at ¶ 49.) In addition, Ramirez observed that when Kidd was at her desk, she spent a great deal of time on the telephone. (*Id.* at ¶ 50.) Kidd's job responsibilities did not require that she spend a great deal of time on the telephone. (*Id.*) Further, Dammer believed that Kidd did not act professionally in the office, spending too much time away from her desk, socializing, and taking extended breaks and lunches. (*Id.* at ¶ 56.)

Dammer complained to ProStaff about Kidd's excessive absenteeism, tardies, extended lunch breaks, and poor performance. Dammer asked ProStaff to counsel Kidd. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶¶ 53, 57) ProStaff later reported to Dammer and Ramirez that it had counseled Kidd. (*Id.* at ¶ 54.) Kidd's attendance and performance problems, however,

3

continued. (*Id.* at ¶ 55.) On January 11, 2001, Dammer called ProStaff to report a conversation she overheard between Plaintiff and two other workers in which they stated that they refused to redo any work that they had already completed. (*Id.* at ¶ 79.)

Ramirez believed that Kidd's frequent absenteeism affected the timeliness of Custom Billing's deliverables and put the department in danger of monetary penalties. (*Id.* at ¶ 131.) On at least one occasion, Dammer stayed late because Kidd was absent from work and had not completed her assignments. (*Id.* at ¶ 132.)

In October 2000, Dammer met individually with the Billing Support Specialists for feedback sessions. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 73.) Kidd expressed an interest in permanent employment, but Dammer told her that a hiring freeze prevented Custom Billing from hiring Billing Support Specialists as permanent employees. (*Id.* at ¶¶ 19, 74.) Kidd further claims that Dammer informed her that once the hiring freeze ended, she was in line for a permanent position. (R. 54-1, Def.'s 56.1(b)(3)(A) Reply at ¶ 35.)

### III. Ameritech Hires Permanent Employees

#### A. January 2001 Hirings

In January 2001, Ramirez received approval to hire four permanent employees. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 76.) Unsure of when she would receive this approval again, Ramirez wanted to hire the strongest performers first. (*Id.* at ¶¶ 76, 77.) Generally, Dammer and Ramirez thought the temporary employees serving as Team Leads had better qualifications and skills than the other Billing Support Specialists. (*Id.* at ¶ 79.)

##### 1. Phillip Johnson

Custom Billing offered one of the permanent positions to Phillip Johnson. Johnson had

4

served as the Team Lead on the General Motors account. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 81.) Johnson also had a longer tenure with Custom Billing than Kidd had. (*Id.* ¶ 86.)

### 2. Terry Archer

#### a. Qualifications

Custom Billing offered a second position to Terry Archer. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 80.) Archer had served as the Team Lead on the Commonwealth Edison account. (*Id.* at ¶ 85.) Additionally, Archer had a longer tenure with Customer Billing been than Kidd had. (*Id.* at ¶ 82.)

#### b. Performance issues

Before receiving an offer of permanent employment, Archer exhibited many work related problems. On various dates during 2000, Dammer complained about Archer leaving "disconnect notices" on his desk while he went on vacation, using the computer and Internet for unauthorized personal purposes, writing personal letters and e-mails at work, placing excessive personal telephone calls, failing to report to work on scheduled days and arriving late to work. (R. 54-1, Def.'s 56.1(b)(3)(A) Reply ¶¶ 60-64, 67, 69-71, 73.) During the period of 2000 and early 2001, Archer was absent approximately 15 days and four half-days. (R. 54-1, Def.'s 56.1(b)(3)(A) Reply ¶ 57.)

On June 21, 2000, Dammer suspended Archer for three days and informed ProStaff that further Internet usage would result in Archer's release from the assignment. (*Id.* at ¶ 65.) Archer spoke with Dammer, apologized for the problems with his attendance, offered to make up the time he had missed, and advised Dammer that his attendance problems resulted from a problematic divorce. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 87.) Neither Ramirez nor Dammer

5

believed Archer's performance suffered as a result of his attendance problems. (*Id.* at ¶ 88.)

### 3. Chris Mirowski

Customer Billing offered a third position to Chris Mirowski. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 80.) There is a dispute as to whether Chris Mirowski served as the Team Lead on the Dow chemical account at the time of his hire. (*Id.* at ¶¶ 91, 92.) Dammer and Ramirez believed, however, that Chris Mirowski, had out-performed Kidd. (*Id.* at ¶¶ 89, 95.)

### 4. Ayoob Meah

Customer Billing offered a fourth position to Ayoob Meah. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 80.) Custom Billing hired Meah not as a Billing Support Specialist, but as a Data Analyst for the Dow account. (*Id.* at ¶¶ 96, 97.) Meah possessed specialized computer skills that Plaintiff did not have. (*Id.* at ¶ 98.)

### 5. **ProStaff informs Kidd the reasons that Ameritech did not hire her**

ProStaff told Plaintiff that Custom Billing did not offer her a permanent position because she had missed too many days of work. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 104.) ProStaff further advised Plaintiff that Custom Billing would not consider her for permanent employment until her absenteeism improved. (*Id.* at ¶ 105.) The ProStaff log entry dated February 23, 2001, referring to this conversation about permanent employment, notes, "BUT, because Terry Archer has so many absences, it does leave a bad taste in everyone's mouth that they are counseled about absences, not able to convert because of them, yet they converted Terry." (R. 54-1, Def.'s 56.1(b)(3)(A) Reply ¶ 80.)

### B. February 2001 Hirings

In February 2001, Ramirez received approval to hire two additional permanent

6

employees. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 106.)

### 1. Michael Troc

Custom Billing used one of the two slots to hire Michael Troc. Custom Billing believed Troc to be among the best of the contract workers because he volunteered for overtime and extra assignments and had no attendance or performance issues. Additionally, Troc had out-performed Plaintiff. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶¶ 109-11.) Custom Billing had previously assigned Troc to the General Motors account as a temporary employee in March 2000. (*Id.* at ¶ 35.) Around the end of 2000, however, Troc became more involved with the EDS/Delphi portions of the GM account. (*Id.* at ¶ 44.) Before converting to permanent status, Troc performed Team Lead responsibilities for the EDS/Delphi account. (*Id.*)

### 2. Lucasz Bala

Custom Billing used the second slot to hire Lucasz Bala. At the time of his hire, Bala served as Team Lead on multiple accounts, including Huntington Bank, State of Wisconsin, BankOne and City of Bellville. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 113.) Dammer and Ramirez believed that Bala was a strong worker who had mastered a number of the different systems used by various accounts. (*Id.* at ¶ 114.) Dammer and Ramirez also believed Bala had out-performed Kidd. (*Id.* at ¶¶ 115, 116.)

### C. March 2001 Hiring

In March 2001, Ramirez learned that she had budget approval to hire one permanent employee to fill an opening on the Dow account. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 117.) Custom Billing did not consider Kidd for the Dow position because she lacked experience on the account. (*Id.* at ¶ 118.) Custom Billing instead hired Robert Mirowski. At the time of this

7

hiring, Dammer and Ramirez believed that Robert Mirowski had more experience on the Dow account than any of the other temporary workers. (*Id.* at Resp. ¶ 119.) They also thought that Robert Mirowski had out-performed Kidd. (*Id.* at ¶¶ 120, 121.)

## IV. ProStaff And Ameritech Terminate Kidd

On April 21, 2001, ProStaff employee Tina McFarland called Kidd and told her that her assignment with Ameritech had ended. (R. 44-1, Pl.'s 56.1(b)(3)(A) Resp. ¶ 134.) Ameritech claimed that it no longer needed Kidd's services because neither her attendance nor her performance were acceptable. (*Id.* at ¶ 133.) McFarland advised Plaintiff that Custom Billing ended her assignment because she was gossiping and was not a team player. (*Id.* at ¶ 135.)

## LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if a reasonable jury, considering the record in a light favorable to the non-movants, can find for the nonmoving party. *See Flores v. Preferred Technical Group*, 182 F.3d 512, 514 (7th Cir. 1999). A non-moving party must present specific facts demonstrating that a genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. at 2552-53.

## ANALYSIS

Kidd alleges sex discrimination under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.*, and age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* In order to succeed, Kidd must show that Ameritech refused to hire her as a permanent employee and terminated her temporary assignment because of her sex or age.

Presenting no direct evidence of discriminatory intent, Kidd can only establish her claim using the indirect "burden-shifting" analysis originally articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Initially, Kidd bears the burden of establishing a *prima facie* case by showing that she: (1) belongs to a protected class, (2) met the legitimate work expectations of her employer, (3) suffered materially adverse employment action, and (4) received treatment differing from that received by similarly situated employees outside of the protected class. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Russell v. Board of Trs. of the Univ. of Ill. at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (applying the *McDonnell Douglas* burden-shifting method to ADEA cases). If Kidd successfully establishes a *prima facie* case, the burden shifts to Ameritech to provide a legitimate, non-discriminatory reason for its actions. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Once Ameritech meets this burden, Kidd must offer evidence showing a genuine issue of material fact regarding whether Ameritech's explanation is mere pretext presented to disguise the employer's true discriminatory intent. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). Despite this burden-shifting analysis, Kidd bears the ultimate burden of proving discrimination at all times. *Gonzalez v. Ingersoll Mill Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998).

I. **Kidd's *Prima Facie* Case**

Ameritech argues initially that Kidd cannot establish a *prima facie* case for sex or age discrimination because her attendance and performance record demonstrate that she was not meeting the company's legitimate expectations. Kidd argues that ProStaff never counseled her regarding performance issues, but rather regarding attendance and long breaks, and that her performance equaled that of other temporary employees. Kidd supports her claims with only her own testimony and that of a co-worker.

Regardless of performance, a poor attendance record alone can cause a plaintiff to fail to meet her *prima facie* case. Repeated absenteeism is central to, and a measure of, overall performance. "An employer has a legitimate interest in insuring that each employee's work continues at a steady pace . . . . Reliability and promptness are important considerations in maintaining a work force." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir. 1992)).

Rather than attempting to show that she can meet the second prong of her *prima facie* case, Kidd argues that the court should relax the legitimate expectations prong because the parties judging Kidd's performance are the same parties accused of discrimination. *See Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001); *Flores*, 182 F.3d at 515. Under this doctrine, if Kidd can demonstrate that Ameritech applied its legitimate expectations differently, the second and fourth elements of the *prima facie* case merge. Once merged, disparate treatment of similarly situated co-workers becomes the keystone of Kidd's *prima facie* case. *Flores*, 182 F.3d at 514; *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002).

Kidd points to Terry Archer as a similarly-situated co-worker whom Custom Billing promoted, despite his poor attendance record. Similarly-situated employees typically answer to

the same supervisor, are responsible for meeting same standards, and exhibit "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Kidd argues that she and Archer are similarly situated because both of them: (1) obtained the Custom Billing assignment through ProStaff, (2) worked as Billing Support Specialists in the same department under Pam Ramirez, and (3) exhibited problems with absenteeism and tardiness. Custom Billing suspended Archer for three days and admonished him for improper Internet usage beyond his absentee issues. Ameritech counters that, unlike Kidd, Archer served as a Team Lead on the Commonwealth Edison account, explained his absenteeism and took steps to remedy the problem. While Team Leads accept more responsibility than other Billing Support Specialists, however, they do not hold separate positions. The Court cannot conclude, providing Kidd with all reasonable inferences and based on the undisputed facts, that being a Team Lead makes Archer dissimilarly situated as a matter of law. Similarly, the fact that Archer explained away his absences and offered to do penance for them does not, as a matter of law, make him differently situated. Kidd has therefore successfully met her *prima facie* burden under *McDonnell Douglas*.

## II. Ameritech's Proffered Reason For Its Adverse Employment Actions

To meet its burden and justify its actions, Ameritech need only provide sincere reasoning, not necessarily a correct or reasonable explanation for its actions. *Flores*, 182 F.3d at 516. Ameritech bears a burden of production, not persuasion, and this burden involves "no credibility assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d

11

407 (1993)).

Ameritech states that it based its refusal to hire Kidd and subsequent decision to end her assignment on Kidd's poor attendance, performance, work behavior, and attitude. Ameritech further states that it hired Archer, Johnson, Troc, and Chris Mirowski for their strong performance and experience handling team lead responsibilities, Robert Mirowski for his experience on the Dow account, and Meah for his computer skills. These proffered reasons satisfy Ameritech's burden of producing a facially legitimate and non-discriminatory for its adverse employment actions. *See Sattar*, 138 F.3d at 1170. "[A]n employer may terminate an employee for any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by a Congressional statute . . . . No such statute proscribes the discharge of an employee who exhibits inappropriate behavior while on the job." *Kahn v. United States Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995).

## III.   Pretext

Because Ameritech proffered non-discriminatory reasons for its adverse employment actions, Kidd must show that a genuine issue of material fact exists as to whether these reasons are each a pretext for discrimination. "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grayson*, 308 F.3d at 820. To demonstrate pretext, Kidd must show that Ameritech's stated reasons are: (1) factually baseless, (2) not the actual motivation for the action, or (3) insufficient to motivate the action. *Peters*, 307 F.3d at 548.

A.  **Kidd has Created a Genuine Issue of Material Fact as to whether Ameritech's Proffered Reason for Terminating her is Pretextual**

Ameritech states that it decided to terminate Kidd's assignment due to her performance problems. Kidd attempts raise a genuine issue of fact on pretext through affidavits by her and a co-worker that state that her work was adequate. Normally this type of evidence is insufficient to raise a question of fact about an employer's honest assessment of inadequate performance. *Dey v. Colt Constr. & Dev.*, 28 F.3d 1446, 1460 (7th Cir. 1994). The Seventh Circuit gives little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance. *Id.*; *see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124-25 (7th Cir. 1994); *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 924 (7th Cir. 1988). For what really matters is not whether the plaintiff was adequately performing her duties, but instead "whether the employer honestly based its employment decision on performance-related considerations." *Dey*, 28 F.3d at 1460.

Kidd, however, has done more than simply raise an issue of fact as to whether her work performance was inferior. She has also shown that one employee, Terry Archer, was not terminated for the same type of misconduct. Despite Ameritech's knowledge of Archer's performance problems, it chose to only suspend him. Meanwhile, it terminated Kidd. Thus, Kidd has raised an issue as to whether her performance problems were, on their own, sufficient to motivate the action. *See Peters*, 307 F.3d at 548. Providing Kidd with all reasonable inferences, that Archer might have been in a slightly different situation because he offered to make amends for his mistakes after Ameritech confronted him is not enough to take this case away from the jury. Accordingly, Kidd's claims that Ameritech terminated her assignment due

13

to her age and her sex can survive.

### B. Kidd has not Created a Genuine Issue of Material Fact as to whether Ameritech's Proffered Reason for Failing to Promote her is Pretextual

Ameritech states that it permanently hired six employees instead of Kidd because they had better credentials for the job. Archer, Johnson, Troc, and Chris Mirowski each had experience handling Team Lead responsibilities. Robert Mirowski had necessary experience on the Dow account. Meah had unique computer skills.

Kidd argues that Ameritech's excuse that it preferred "Team Leads" is pretextual. Kidd points out that neither Troc nor Chris Mirowski was a Team Lead at the time of hire. Ameritech points out, however, that they both had experience performing the responsibilities of Team Lead. "Team Lead" is an unofficial position characterized more by increased responsibilities than an actual title. Whether or not Troc and Mirowski were designated Team Leads, it is undisputed that they performed those duties. Therefore, Kidd has not shown that Ameritech's reason for hiring those performing Team Lead responsibilities over her is a pretext for discrimination. Accordingly, Kidd's failure to promote claims fail.

## CONCLUSION

Ameritech's motion for summary judgment is granted in part and denied in part. Kidd has not presented sufficient evidence from which a reasonable finder of fact could conclude that Ameritech's articulated reasons for refusing to permanently hire her camouflaged intentional discrimination. Kidd, however, has created a genuine issue of material as to whether Ameritech's proffered reasons for terminating her assignment were a pretext for age and sex discrimination.

Dated: August 15, 2003            ENTERED

                                  _____
                                  AMY J. ST. EVE
                                  U.S. District Court Judge